**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**KEVIN LYONS,**

      **Petitioner,**

**vs.**

                                       **Case No. 4:07cv369-MP/WCS**

**WALTER A. McNEIL,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

Respondent's motion to dismiss the amended 28 U.S.C. § 2254 petition as untimely, doc. 8, was denied.  Docs. 15 and 17.  Respondent filed an answer and exhibits under seal.  Docs. 22 (answer) and 24 (notice of filing).  Petitioner was given the opportunity to file a reply but was not required to do so.  Doc. 28.  He did not reply, and this case is now ready for ruling.

References to Exs. A-B are to the exhibits attached to the motion to dismiss (doc. 12), and references to Exs. C-O are to those submitted with the notice of filing (doc. 24), which are sealed.  See doc. 23.

**Procedural History**

Petitioner challenges the judgment and sentence imposed by the Circuit Court of the Third Judicial Circuit, in and for Madison County, Florida, case number 2001-119-CF.

Count one of the information charged that on or about January 11, 2001, Petitioner, a person 18 years or older, committed sexual battery on K.L., a person less than 12 years of age, by uniting his penis with the anus of K.L.. Ex. E, p. 241. This is a capital offense. Count two charged that on or about January 11, 2001, Petitioner, a person 18 years or older, unlawfully and intentionally touched in a lewd and lascivious manner the breasts, genitals, genital area, or buttocks, or the clothing covering them, of K.L., a person less than 12 years of age. *Id.*

A jury found Petitioner guilty of sexual battery on a child under the age of 12 as charged in count one, and guilty of lewd molestation of a child under the age of 12 as charged in count two. Ex. E, pp. 228-229. Petitioner was sentenced to life in prison on count one, to thirty years on count two, to run concurrently with the life sentence, and was designated a sexual predator. *Id.*, p. 237.

As summarized in Petitioner's initial brief on appeal, Ex. J, the evidence was as follows. Julie Schmidt, who had divorced Petitioner by the date of trial, testified that she and Petitioner had been married about four years before the January 2001 incident. Ex. J, p. 4. They had a son and daughter, ages three years and eighteen months, respectively, at the time of the incident. *Id.* The family moved to Madison County in August of 2000, and she and her husband were having marital problems due to his lack of involvement with the family. *Id.* They separated in December of 2000, and Petitioner

went to live with his cousin a short distance away from where Schmidt was living with the two children.  *Id.*  For the next few weeks they attempted to reconcile.  *Id.*

On January 10, 2001, Petitioner spent the night at the family home with the understanding the couple would reconcile and he would move his things back into the home the next day.  *Id.*  On the morning of January 11, 2001, Schmidt went to an appointment and left the children at home with Petitioner for about three hours.  *Id.*, pp. 4-5.  She returned to pick up Petitioner and the children, drove Petitioner to his cousin's house and dropped him off, then continued with the children in the car to another appointment.  *Id.*, p. 5.  At some point while Schmidt was driving, K.L. asked her what were the words to say something.  She asked what it was he wanted to say, and he said "[f]or when Daddy sticks his penis in my ass."  *Id.*  She asked him what he said, and K.L. repeated it.  *Id.*  She asked what happened, and K.L. said the incident happened when she was gone that morning.  *Id.*  She said K.L. was taught the word "penis" but not "ass," and he usually used the term "bottom."  *Id.*

Schmidt drove the children to their appointment for physical exams but did not mention any of this to the nurse at that time.  *Id.*  K.L. brought it up again on the ride home, and Schmidt asked if he said anything to his father when it happened.  *Id.*  K.L. said he told his father it hurt so he stopped for a minute but then did it hard again.  *Id.*, pp. 5-6.  He said it happened in the chair in the living room.  *Id.*, p. 6.

When they got home Schmidt looked at K.L.'s bottom, and said his anus looked a little red and she thought she smelled semen.  *Id.*  She called the abuse hotline and was told to contact the child's doctor, and called the doctor, who could not see K.L. until

the next day.  *Id.*  In the meantime Petitioner called there a number of times, asking when Schmidt was going to pick him up.  *Id.*

Schmidt talked to Petitioner on the phone, described what K.L. told her, and asked Petitioner if he did it.  *Id.*  Petitioner responded, "We have to talk."  *Id.*  Schmidt again tried to call the abuse hotline but the line was repeatedly busy.  *Id.*  She then drove to Petitioner's brother's house so she could talk to Petitioner.  *Id.*[1]  Petitioner's brother watched the children so she could talk to her husband.  *Id.*  She asked if he did it and he answered "yes."  *Id.*  He tried to say more but Schmidt hit him, screamed, and ran away.  *Id.*, pp. 6-7.

Schmidt called the police and gave a statement to Deputy Doug Haskell.  *Id.*, p. 7.  Haskell came to her home that evening and she gave him a written statement.  *Id.*  He asked for K.L.'s clothing, but Schmidt had already washed his clothing and had disposed of his diaper.  *Id.*

The next day, K.L. received a physical examination by a nurse practitioner.  *Id.*  He was hysterical during the exam.  *Id.*  Counseling sessions were set up by the Child Protection Team.  *Id.*

Schmidt admitted on cross examination that she and Petitioner attempted a reconciliation after this incident.  *Id.*  She also admitted that they had had sexual relations.  *Id.*

Deputy Haskell testified that he took a statement from Schmidt, and acknowledged that he did not have specialized training in sexual abuse cases.  *Id.*  He

---

[1] Schmidt dropped him off at his cousin's house earlier.  Petitioner's brother got off from work early that day, and picked Petitioner up from his cousin's house.  Ex. F (transcript of hearing held August 19, 2002), p. 43.

did not interview K.L. or collect any physical evidence.  *Id.*  On the evening of January
11, 2001, Schmidt gave him the written statement which said that she said she smelled
semen and that K.L. indicated he performed oral sex on Petitioner, things Schmidt had
not said when she talked to Haskell earlier.  *Id.*, p. 8.  Haskell tried to locate Petitioner
but learned Petitioner had admitted himself into PATH (a psychiatric facility) and could
not be interviewed.  *Id.*

On redirect, Schmidt's prior written statement (which referred to smelling semen
and K.L. performing oral sex) was admitted over defense counsel's objection that it was
improper rebuttal.  *Id.*

Angela Myers, a nurse practitioner who examined K.L. the day after the incident,
testified as an expert in sexual abuse determinations.  *Id.*  She said K.L. was upset,
crying, and distraught during the examination.  *Id.*  She said his anal area was red and
irritated but without visible tearing.  *Id.*, pp. 8-9.  She took anal swabs to test for semen,
but could not test for micro abrasions using toluene blue because K.L. was so
distraught.  *Id.*, p. 9.  p. 8.  She thought the redness was consistent with anal
penetration, and said in small children the anus is elastic and would not necessarily tear
on penetration.  *Id.*  On cross examination, she admitted that she indicated in her report
a number of possible findings were not applicable, and that the results of the exam
"neither confirm nor negate" the charge of sexual abuse.  *Id.*

On redirect, Myers said that most types of sexual abuse do not leave physical
damage, so these results did not show there was no sexual abuse, and her physical
findings were consistent with the child's history.  *Id.*, pp. 9-10.

Elaine Schmidt, grandmother of K.L. and mother of Julie, testified that she moved in with her daughter and the two children in June of 2001. *Id.*, p. 10. She said about six weeks after she moved in, K.L. spontaneously told her that his father put his penis in his bottom. *Id.* She asked K.L. how he felt and K.L. said he thought he liked it, because he liked his father. *Id.* K.L. was crying when he told her this. At the time of this statement he was being punished with a "time out" in his bedroom. *Id.*

Stacy Bronson, who formerly worked with Petitioner at Pep Boys, testified. *Id.* Defense counsel objected to this testimony as he had not been able to depose Bronson, but did not allege a discovery violation and Bronson's testimony was allowed. *Id.* Bronson said that he and Petitioner were friendly at work and talked on the phone sometimes. *Id.* On January 11, he saw Petitioner when he came to Pep Boys to quit and pick up his paycheck, and Petitioner told Branson he was going to prison. *Id.*, pp. 10-11. Bronson called Petitioner later, and Petitioner admitted that he had his son perform oral sex on him and had penetrated his son. *Id.*, p. 11. Bronson told the store manager not to rehire Petitioner, and made an anonymous call to the sheriff's office. *Id.* He was later interviewed by FDLE Agent Mortenson. *Id.*

Dr. Mary Waters, a psychologist who counseled K.L., was qualified as an expert witness in psychology. *Id.*, p. 11. As a member of the Child Protection Team, she said there was protocol to follow in counseling children who might have been abused, and she followed the protocol here. *Id.* Children usually have six sessions, but if a disclosure about abuse is made earlier then only one more session is held after that. *Id.* It was common for children not to disclose abuse in initial interviews. *Id.*

Waters said that in her fifth session with K.L., he told her his father "stuck his penis in his butt." *Id.*, pp. 11-12. K.L. said his father made a mess and "white peepee" came out. *Id.*, p. 12. K.L. said it hurt. *Id.* He said his father's penis was big with "bones in it," and K.L.'s penis was little. *Id.* K.L. said after his mother left the house, his father said he wanted to "mess with" K.L.'s penis. *Id.* Petitioner had K.L. touch his own (K.L.'s) penis in an up and down motion which Petitioner demonstrated for K.L. with his hand. *Id.* K.L. said he liked it and did not cry, but hurt when he put his penis in his butt, and K.L. told his father not to do it so hard. *Id.* K.L. said they had no clothes on, but his father put K.L.'s diaper back on afterwards. *Id.* His father said not to tell his mother because it was a secret. *Id.* On cross, Waters said K.L. initially informed her that his father did not do anything to him. *Id.*

FDLE Agent Bernard Mortenson testified. *Id.* On August 9, 2001, he interviewed Petitioner about the incident. *Id.*, pp. 12-13. They met at Winn Dixie, where Petitioner was then employed, in the break room and Mortenson did not wear a uniform or carry a weapon. *Id.*, p. 13. He said Petitioner was not under arrest and he made no threats or promises to Petitioner, and Petitioner was cooperative in speaking to him about the incident. *Id.* Petitioner told Mortenson he thought his ex-wife made up the allegations because he was unfaithful during their marriage. *Id.* Petitioner told Mortenson he did not remember anything that happened on January 11, 2001, that he used about an ounce of cocaine that morning and had a serious cocaine habit. *Id.* The agent asked if he could have done it and not remembered; Petitioner said anything was possible but he did not think he could do something like that. *Id.* Petitioner also said he had

thoughts and dreams about molesting and harming K.L. and committing suicide. *Id.*
The thoughts scared him into checking himself into a psychiatric ward. *Id.*, pp. 13-14.

The State rested and Petitioner did not present a case. *Id.*, p. 14. On the court's
inquiry Petitioner confirmed that it was his decision not to testify. *Id.* A motion for
judgment of acquittal was denied. *Id.* The defense rested and the state presented no
rebuttal. *Id.* Petitioner's request for a jury instruction on the lesser included offense of
attempt as to each count was denied. *Id.* A guilty verdict was returned on each count.
*Id.* The judgment was affirmed without opinion. Ex. I; Lyons v. State, 879 So. 2d 629
(Fla. 1st DCA 2004) (Table).

Petitioner sought post conviction relief pursuant to Fla.R.Crim.P. 3.850. Ex. N,
pp. 1-49, 110-157.[2] A response and reply were filed (Ex. N, pp. 51-93), and the trial
court denied the motion without an evidentiary hearing. Ex. N, pp. 94-157. Denial was
affirmed without opinion, and rehearing denied. Exs. M, O.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have
exhausted their claims in state court. 28 U.S.C. §§ 2254(b)(1), (c)." O'Sullivan v.
Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). To properly
exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented
to the state courts." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d

---

[2] Pp. 1-48 and 110-157 of Ex. N are copies of the same Rule 3.850 motion, as
the court attached a copy the Rule 3.850 motion to the order denying relief (p. 1 of the
motion is p. 110 of the record, etc.). References are to the copy attached to the order.
A copy of the Rule 3.850 motion was also provided as Ex. A (doc. 12-2), which was not
sealed.

438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865

(1995) (*citing* Picard).

If a claim was not fairly presented but is procedurally barred from further state

court review,[3] Petitioner must demonstrate cause for the default and actual prejudice, *or*

demonstrate that the constitutional violation has probably resulted in conviction of an

innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115

L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-

71, 113 L.Ed.2d 517 (1991).

For claims that were properly exhausted and adjudicated in state court, this

court's review is limited.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct," and Petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

This applies to factual findings by both the trial and appellate courts.  Dill v. Allen, 488

F.3d 1344, 1354 (11th Cir. 2007) (citing Bui).

Section § 2254 relief will not be granted on a claim adjudicated in state court

unless adjudication "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State

---

[3] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available."  The court therefore refers to "fairly presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default.  *See* O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

court proceeding."  § 2254(d); Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct.

1495, 1519-1520, 146  L.Ed.2d 389 (2000) (discussing the different meanings of the

"contrary to" and "unreasonable application" clauses of § 2254(d)(1)); Bell v. Cone, 535

U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> [A] federal court may not issue a writ of habeas corpus setting aside a
> state court's denial of a federal constitutional claim unless the petitioner
> demonstrates that the state court's decision is flawed for one or both of
> the reasons listed in 28 U.S.C. § 2254(d).  The first reason is that the state
> court misapplied the relevant holdings of the United States Supreme
> Court; the second reason is that the state court's findings of fact lack
> evidentiary support.  In assessing the state court's findings of fact, we
> "presume" those findings are "correct."  See id.; 28 U.S.C. § 2254(e)(1).  If
> the petitioner contends that the findings of fact are not correct, he bears
> the burden of establishing that they are not correct by "clear and
> convincing evidence."  Id. ("The [petitioner] shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.").

Pace v. McNeil, 556 F.3d 1211, 1223 (11th Cir. 2009) (citation and footnotes omitted).

The basic law governing ineffective assistance of counsel claims was clearly

established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984); Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520.

Ineffective assistance of counsel is a two part inquiry.  "A convicted defendant making a

claim of ineffective assistance of counsel must identify the acts or omissions of counsel

that are alleged not to have been the result of reasonable professional judgment," and

must also "affirmatively prove prejudice."  Strickland, 466 U.S. at 690, 693-694, 104

S.Ct. at 2066-68.  The court need not approach the Strickland inquiry in any particular

order, or address both prongs if an insufficient showing is made on one.  466 U.S. at

697, 104 S.Ct. at 2069.  A petitioner "bears the burden of proof on the 'performance'

prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be

proved to prevail."  Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001), *cert.*

*denied*, 535 U.S. 926 (2002).  The cases which prevail under Strickland "are few and far

between."  *Id.* (citation omitted).

>       To demonstrate prejudice,
>
>       The defendant must show that there is a reasonable probability that, but
>       for counsel's unprofessional errors, the result of the proceeding would
>       have been different.  A reasonable probability is a probability sufficient to
>       undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068.  The assessment does "not depend on the idiosyncracies

of the particular decisionmaker," as the court should presume that the judge or jury

acted according to law.  *Id.* at 694-95, 104 S.Ct. at 2068.  "When a defendant

challenges a conviction, the question is whether there is a reasonable probability that,

absent the errors, the factfinder would have had a reasonable doubt respecting guilt."

*Id.* at 695, 104 S.Ct. at 2068-69.

>       In making this determination, a court hearing an ineffectiveness claim
>       must consider the totality of the evidence before the judge or jury.  Some
>       of the factual findings will have been unaffected by the errors, and factual
>       findings that were affected will have been affected in different ways.
>       Some errors will have had a pervasive effect on the inferences to be
>       drawn from the evidence, altering the entire evidentiary picture, and some
>       will have had an isolated, trivial effect.  Moreover, a verdict or conclusion
>       only weakly supported by the record is more likely to have been affected
>       by errors than one with overwhelming record support.  Taking the
>       unaffected findings as a given, and taking due account of the effect of the
>       errors on the remaining findings, a court making the prejudice inquiry must
>       ask if the defendant has met the burden of showing that the decision
>       reached would reasonably likely have been different absent the errors.  . .
>       . [T]he ultimate focus of inquiry must be on the fundamental fairness of the
>       proceeding whose result is being challenged.

*Id.* at 695-96, 104 S.Ct. at 2069.

A state court's adjudication of an ineffective assistance claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently.  Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852.  To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner claims that counsel was ineffective in failing to investigate and depose Stacey Bronson; failing to obtain the telephone records of Bronson, Petitioner, and Pep Boys to use in impeaching Bronson's testimony; failing to call "Jamie"[4] (an employee of Pep Boys) to impeach Bronson; and failing to call Beverly Hanners to establish that Bronson had a motive for giving false testimony.   Doc. 8, pp. 4-4(a)(3) (pp. 5-8 of the document as scanned in ECF) (electronic case filing system)  Petitioner claims that at a deposition, counsel "would have learned about his [Bronson's] purported conversation with a fellow Pep Boys Employee named 'Jamie' and a follow-up investigation would have shown that no such conversation took place between Bronson and 'Jamie,'" thus

---

[4] Respondent refers to Petitioner's argument as the failure of counsel to call "Jaime" as a witness.  Doc. 22, pp. 24-27.  The court uses the spelling used by Petitioner.

impeaching Bronson.  *Id.*, p. 4 (p. 6 in ECF).  Had counsel reviewed telephone records,

Petitioner claims, they would have shown that no conversation took place between

Bronson and Petitioner, impeaching Bronson's claim that Petitioner made admissions to

him.  *Id.*, pp. 4-4(a) (pp. 5-6 in ECF).[5]

Petitioner claims he asked counsel to interview Beverly Hanners (married to

Petitioner's cousin)  "many months prior to trial."  *Id.*, p. 4(a)(2) (p. 7 in ECF).  He

asserts "after Petitioner quit work at Pep Boys, he and Bronson remained on friendly

terms and continued to hang out together occasionally . . . until Petitioner's wife . . .

phone[d] Bronson's supervisor at Pep Boys and told him that Branson was hanging out

with, and smoking marijauna [sic] with Petitioner after his shift at Pep Boys."  *Id.*

Petitioner asserts that Hanners would have testified that Bronson called her (and

others) and "Bronson told Ms. Hanners that it was Petitioner's fault that he (Bronson)

had lost his job, and also told her that he was going to 'kill' Petitioner."  *Id.*   Petitioner

claims he "told defense counsel about that incident" months before trial, but counsel

failed to interview Hanners or Bronson's supervisor to establish Bronson's motive for

falsely claiming that Petitioner admitted the offense to him.  *Id.*  Petitioner claims

prejudice because Bronson's testimony was "essential," since there was no physical

evidence establishing that the offense occurred, or evidence linking Petitioner and the

offense.  *Id.*  The only other evidence against him, he claims, was "inconsistent hearsay

testimony."  *Id.*, p. 4(a)(3) (p. 8 in ECF).

---

[5] Petitioner also claims that if counsel had called him to testify in his own defense
as Petitioner wanted to do, he would have impeached Bronson by saying he never
made admissions to him and did not molest his son.  *Id.*  The court addresses the claim
regarding Petitioner's wish to testify separately.

The state court rejected Petitioner's claim of ineffectiveness for failure to

investigate or depose Bronson:

> While it is true that the witness Bronson was not deposed, a specific
> statement that Stacey Bronson had given to Special Agent Bernie
> Mortenson, which contained the essence of witness Bronson's testimony,
> was disclosed by the State.  The defense was, therefore, fully aware of the
> testimony that witness Bronson would present at trial, and cannot be said
> to have been surprised.  The Defendant's counsel did attempt to depose
> witness Bronson, however, the witness failed to appear at the two
> scheduled depositions.  However, the Defendant's trial counsel was able
> to speak with witness Bronson prior to the beginning of the trial.
> Additionally, the Court found that it was proper for witness Bronson to
> testify, and allowed the testimony over the objection of the Defendant's
> trial counsel based on the failure of the witness to appear for depositions.
> As the Defendant's counsel was aware of the testimony of the witness,
> and the witness was allowed to testify over his counsel's objection, it
> cannot be said that the Defendant's counsel was ineffective.

Ex. N, p. 94 (rejecting ground one of the 3.850 motion).

The state court rejected a claim regarding counsel's failure to discover or call

Beverly Hanners as a witness, but Petitioner did not raise the same claim summarized

above.  Instead, he claimed in his Rule 3.850 motion that "Hanners would have testified

that she was at the residence where the Defendant was living and that no one called

him on the telephone, as witness Bronson testified."  *Id.*, p. 95 (ground six of the Rule

3.850 motion).  Bronson testified that Petitioner admitted on the phone to molesting his

child, so if the jury heard the testimony of Hanners which contradicted Bronson,

Petitioner claimed, he would not have been found guilty.  *Id.*  In ruling on this claim, the

state court said:

> This Court finds that argument of the State is persuasive, in as much as
> *the Defendant does not aver that his trial counsel was made aware of
> witness Hanners*.  Additionally, this court does not find it persuasive that
> the verdict rendered by the jury is more likely than not to be changed by

the general nature of the testimony the Defendant suggests witness
Hanners would have presented.

*Id.* (emphasis added).  This finding is supported by the record.  The claim that Petitioner

*advised counsel* about the possible testimony of Hanners possible months before trial

was not alleged in his Rule 3.850 motion.  Ex. N, p. 22.  He only alleged in the Rule

3.850 motion that Hanners "would have testified that she was at home when the

Defendant got the house that day, and nobody had called at any time to speak to

Defendant."  *Id.*

Moreover, the basis for his § 2254 claim here, is different from that asserted in

state court in the Rule 3.850 motion.  That telephone call, according to Bronson, was

made on or about January 11, 2001, and Bronson thought he called Petitioner at his

house.  Ex. D, pp. 132-135.[6]  The claim here is that Hanners would have testified to a

falling out between Petitioner and Bronson after Bronson lost his job at Pep Boys, which

occurred at least several months after the offense and the telephone call on January 11,

2001.  *Id.*, p. 137-140.[7]

---

[6] Petitioner was not at his own residence after K.L. made the initial disclosure.
According to Schmidt, Petitioner was dropped off at the home of his cousin (Hanners),
K.L. then made the disclosure to her, Petitioner called her several times to find out when
she was picking him up, and he was at his brother Ricky's house when she confronted
him.  Ex. D, pp. 66-77.

[7] Bronson thought he worked at Pep Boys six or seven months after Petitioner
left, then said "like before Summer, like the end of Spring."  *Id.*, pp. 137-138.  He
thought he was still working there when he talked to Agent Mortenson, but when asked
if that interview was in October of 2001 (when he would no longer have been working
there), he thought the interview might have been in January.  *Id.*, pp. 138-140.  Bronson
was asked on cross examination if he and Petitioner had a falling out, Bronson said they
had not, and were still friends.  Ex. D, p. 140.

As Petitioner "did not raise this specific claim of ineffective assistance of counsel in state court, the claim is procedurally barred." Jones v. Campbell,  436 F.3d 1285, 1299 (11th Cir.), *cert. denied,* 549 U.S. 1030 (2006), *citing* Johnston v. Singletary, 162 F.3d 630, 634-35 (11th Cir.1998).  He has not shown cause and prejudice for his default.  Grubbs v. Singletary, 120 F.3d 1174, 1178 (11th Cir. 1997), *cert. denied*, 523 U.S. 1060 (1998) (petitioner did not present in state court specific instances of ineffective assistance presented by § 2254 petition, would be precluded from presenting them in a successive Rule 3.850 motion, and therefore had to demonstrate cause and prejudice for his default) (citations omitted).  There can be no cause for his default here, as Petitioner alleges here that he knew and informed counsel of Bronson's angry call to Hanners months before trial.

The state court rejected as conclusory and not supported by facts Petitioner's claim "that his trial counsel failed to investigate the phone call from witness Bronson to the Defendant, and show that the phone records do not support that such a call was made." *Id.*, pp. 95-96 (sequentially ground seven in the Rule 3.850 motion, listed as ground eight).[8]  This was because Petitioner did not "show proof or offer any evidence that bills exist which would prove that no phone calls were made to the Defendant by witness Bronson." *Id.*  Petitioner had claimed in his Rule 3.850 motion that with investigation, counsel would have discovered Bronson's calls were "toll calls" and would therefore appear on phone records.  Ex. N, p. 116.  It is not clear exactly what Petitioner meant by "toll calls" (perhaps calling collect, or long distance), or why Bronson would

---

[8] When the grounds were numbered in the Rule 3.850 motion, Petitioner skipped number seven.

necessarily only be able to reach Petitioner (and at what location, see *supra*, nn. 1 and 6[9]) using "toll calls."  Further, Petitioner's counsel twice tried to depose Bronson and was unsuccessful.  He made an objection as to this at trial and was overruled.  He did not, therefore, have a chance to ask Bronson about telephone calls and records prior to trial.  Finally, as in state court, this claim is unsupported here.  An assertion that there would have been independent proof of whether or not a telephone call had been made, without more, is entirely speculative.

Petitioner did not raise an ineffectiveness claim in state court for counsel's failure to call "Jamie" or "Jaime" as a witness, so that claim is procedurally barred.[10]  Ex. N, pp. 1-47.  Further, as noted by Respondent, the claim is too vague to present any grounds for relief.  Even now Petitioner does identify this witness by his last name, and does not provide any specifics as to his anticipated testimony.  Doc. 22, p. 25.  He only alleges that "Jamie" would have impeached Bronson.  Ex. 8, p. 4(a); p. 6 on ECF.  This is insufficient to establish error of counsel or prejudice.  *See* Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir.1985), *cert. denied*, 479 U.S. 918 (1986) (a  defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel).

---

[9] It is not alleged or apparent where Bronson was when he placed the call. Bronson testified that he called Petitioner about an hour after Petitioner left that day, and after he talked to Petitioner "I went back to the store."  Ex. D, pp. 133-135

[10] Bronson testified that after Petitioner admitted to him on the phone that he molested his son, Bronson went back to work, and "I was like, 'Jamie, don't put Kevin in the system as a rehire,'" and when Jamie asked "why?" he told him what Petitioner had told him, "[a]nd then we put him in the computer as non-hireable."  Ex. D, p. 135.  He continued, "[a]nd then, I don't know, his wife said I was trying to ruin his life."  *Id.* Defense counsel's objection was sustained and the jury directed to disregard what his wife may have said.  *Id.*

As to the ineffectiveness of counsel claims raised in state court regarding witness Bronson there was no error of counsel or resulting prejudice, and the state court's adjudication was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts. § 2254(d). As to the claims raised in ground one not presented in state court, Petitioner has not shown cause or prejudice for his default, and the court cannot reach the merits of those claims.

**Ground Two**

Petitioner claims ineffectiveness of counsel for failing to make a legally sufficient, contemporaneous objection to the introduction of Schmidt's written statement as given to Deputy Haskell. Doc. 8, pp. 4 and  4(b) (pp. 5 and 9 in ECF). Petitioner claims that Haskell responded to the call and twice traveled to Schmidt's residence. *Id.* The first time he wrote down Schmidt's version of the incident but did not collect clothing from the victim; the second time he obtained a written statement from her and was unable to collect clothing because Schmidt had already washed the clothes and discarded the diaper. *Id.*, p. 4(b) (p. 9 in ECF). Defense counsel objected to the written statement given to Haskell on his second visit as improper rebuttal. *Id.* The prosecutor argued it was admissible in response to a claim of recent fabrication of Schmidt's testimony, and the court overruled the objection. *Id.*

According to Petitioner, counsel should have argued that the written statement was inadmissible hearsay because Schmidt already testified to the same facts at trial, and there had been no insinuation of recent fabrication; instead he was "merely highlighting" that the second written statement contained facts not mentioned in her initial statement. *Id.*, p. 4(b)(2) (p. 10 in ECF). Had counsel made the proper

arguments, Petitioner claims, the court would have sustained the objection; or if it did

not, would have been reversed on appeal because it cannot be said that the written

statement did not play a part in the jury returning a guilty verdict.  *Id.*, p. 4(b)(3) (p. 11 in

ECF).

Respondent asserts that a statement is not hearsay if the declarant testifies at

trial, is subject to cross examination about the statement, and the statement is

consistent with the trial testimony and offered to rebut an express or implied charge of

fabrication.  Doc. 22, p. 30, citing FLA. STAT. § 90.801(2)(b).  Schmidt testified and was

subject to cross examination.  Respondent claims there was an insinuation of recent

fabrication because counsel asked about marital problems and separation, and her

anger toward Petitioner.  *Id.*, p. 31.  Moreover, it is argued, the prior consistent

statement was cumulative to evidence already presented so Petitioner cannot establish

prejudice. *Id.*, pp. 31-32.

The state court rejected this claim finding that counsel did object, "however, the

State pointed out that the defense opened the door that allowed the introduction of the

documents.  Thus, the documents were properly introduced."  Ex. N, p. 95.

Petitioner has not shown error or prejudice.  Schmidt was cross-examined by

Petitioner's attorney and admitted that prior to the abuse accusations, she had asked

him to leave their home, was angry with him because he did not want to be part of the

family, and that Petitioner acceded to her demands to try to reconcile.  Ex. D, pp. 84-85.

These questions raised the possibility that she had a motive to falsely accuse Petitioner.

Also, Schmidt had testified on direct that she examined her child's bottom and thought

that she smelled semen.  *Id.*, p. 72.  Counsel made a point on cross examination of

establishing that Schmidt may not have told Officer Haskell on his first visit that she had

smelled semen on the child's bottom, and so he again raised the possibility of

fabrication of that testimony and opened the door to evidence of the second statement.

*Id.*, pp. 89-90.  Further, contrary to Petitioner's claim that there was no claim of recent

fabrication, clearly the defense strategy was to question the credibility or motivation of

the prosecution's witnesses, including Petitioner's former wife.  *See* Ex. E, pp. 189-191,

212, 214 (defense counsel's closing argument).  Petitioner has identified nothing in the

written statement that was any different or more prejudicial to him than what Schmidt

and Haskell already said she had reported to Haskell.  There was no error or resulting

prejudice in counsel's failure to make the argument, and the state court's adjudication

was not contrary to or an unreasonable application of clearly established federal law, or

based on an unreasonable determination of the facts.  § 2254(d).

**Ground Three**

Petitioner claims ineffective assistance of counsel for counsel's failure to object to

prior bad acts evidence when proffered out of the presence of the jury, and his failure to

contemporaneously object when the evidence was introduced at trial.  *Id.*, p. 5-5(a) (pp.

12-13 in ECF).

The evidence at issue was brought in through the testimony of FDLE Special

Agent Bernard Mortenson, that prior to Petitioner's arrest he asked Petitioner about

Schmidt's statements and Petitioner answered that he had no recollection because of

his heavy use of cocaine up to and including the day of the incident.  *Id.*, p. 5(a) (p. 13 in

ECF).  Petitioner claims that after the proffer, defense counsel said he had no

objections because it was a non-custodial statement,[11] and did not object when the

testimony was given before the jury.  *Id.*

Petitioner asserts this "*Williams* rule" evidence[12] was inadmissible and prejudicial

as it destroyed the presumption of innocence, and counsel should have sought to limit

Mortenson's testimony to exclude any mention of his cocaine use as inadmissible, as

well as irrelevant to the issue of guilt in this case.  *Id.*, pp. 5(a)-5(a)(2) (pp. 13-14 in

ECF).  Had counsel made the proper arguments, Petitioner claims, the court would

have sustained the objection; or if it did not, the error would have been reversed on

appeal.  *Id.*, p. 5(a)(2) (p. 14 in ECF).  Petitioner contends it cannot be determined that

this testimony did not play a part in the jury returning a guilty verdict, because there was

no physical evidence of a crime and the only other evidence was inconsistent hearsay.

*Id.*, p. 5(a)(2) (p. 14 in ECF).

---

[11] A proffer was made of what Mortenson would say Petitioner said, counsel was asked for any objections and he noted the statement was not made while Petitioner was in custody.  Ex. D, pp. 11-18.  The court found that the statement was freely and voluntarily given.  *Id.*

[12] Williams v. State, 110 So. 2d 654 (Fla. 1959); FLA. STAT. § 90.404(2)(a) (2002) (codifying the rule).

> Under the *Williams* rule evidence of other crimes, wrongs and acts is
> admissible if it is relevant to and probative of a material issue even though
> the evidence may indicate the accused has committed other uncharged
> crimes or may otherwise reflect adversely upon the accused's character.
> Section 90.404(2)(a), Florida Statutes, (1983), codifies the ruling in
> *Williams v. State* and lists the purposes for which such evidence is
> deemed to be admissible: proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or accident.

Buenoano v. State, 527 So. 2d 194, 197 (Fla. 1988), *cert. denied*, 523 U.S. 1043 (1998).

The state court rejected this claim of ineffectiveness, finding "the statement given to Special Agent Mortenson regarding the Defendant's use of cocaine was ruled admissible in an in camera proceeding.  As the statement found to be admissible, Defendant's trial counsel cannot be said to be ineffective for failing to file a motion to exclude testimony."  Ex. N, p. 95.  The court did not address whether a *Williams* rule argument could or should have been made.

In Florida, evidence of other crimes, wrongs or acts is admissible when relevant to prove a material fact in issue, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but is not admissible where relevant only to prove bad character or propensity to commit crime. FLA. STAT. § 90.404(2)(a); Hodges v. State,  885 So. 2d 338, 357 (Fla. 2004) (citing Williams; also noting that admissibility of collateral crime evidence is within the discretion of the trial court, reversible only for abuse of discretion).

Here, when Mortenson asked Petitioner about the accusations made by his son and by his wife, Petitioner claimed to have no recollection of the incident or any event on that particular day due to his cocaine habit and recent cocaine use.  Ex. D, p. 167.  He told Mortenson "he had used approximately one ounce of cocaine prior to anything happening.  He said he'd been doing that for over three months and he had a serious habit."  *Id.*, p. 168.  Asked if it was possible he did it and did not remember because of his cocaine use, Petitioner "replied that it was possible or that anything was possible, like that, but he did not want to think that he could or would do something like that to his son."  *Id.*

Petitioner's admission to drug use was inextricably intertwined with his voluntary out of custodial response to the officer's questions, explaining his lack of recollection of anything that happened that whole day.  Petitioner's recollection of events was directly relevant to Petitioner's intent, knowledge, planning, and mistake or accident, material the issues the jury had to decide.  It was admissible under Florida law.  <u>Coolen v. State</u>, 696 So. 2d 738, 742 (Fla. 1997) (finding admissible a defendant's statement that he saw that the victim had "something silver in his hand," and he had reacted defensively, stabbing the victim, because his previous " 'eight years in maximum prisons up in Massachusetts' had taught him not to take chances, to 'react very quickly,' and that it's better to 'be safe than sorry.' ").

Respondent also argues that a reasonable lawyer might have determined as a tactically matter that this evidence could diminish Petitioner's culpability in the eyes of the jury, which would otherwise find incredible his claim that he had no memory, and that it would be "absurd" to believe a jury convicted Petitioner of this act on his own child based on testimony that he used cocaine.  Doc. 22, pp. 35-36.  These arguments are persuasive.  That Petitioner admitted to using cocaine was the least of his problems at trial, and it conceivably was evidence in mitigation.

For all of these reasons, there was no error or resulting prejudice in counsel's failure to challenge this evidence.  The state court's adjudication was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence.  § 2254(d).

**Ground Four**

Petitioner claims that counsel was ineffective in failing to challenge the qualifications of Angela Myers to testify as an expert witness, failing to investigate the medical evidence and use it during cross examination of Myers, and for failing to perform an adequate cross examination of Myers.  Doc. 8, pp. 5 and 5(b) (pp. 12 and 16 in ECF).

Respondent asserts procedural bar as to some of the questions or objections Petitioner faults counsel for not making during cross examination.  Doc. 22, pp. 38-39. The analysis therefore begins with the claims raised and adjudicated in state court.

Labeled as ground nine in the Rule 3.850 motion, Petitioner claimed ineffective assistance of counsel for failing to investigate and object to Myers' opinion testimony. Ex. N, pp. 134-136.  Specifically, Petitioner claimed that counsel should have objected to her testimony that the results of her examination did not confirm or negate sexual abuse, that "an examination should not be viewed as evidence that sexual abuse did not take place," and her testimony that the anus is "very accommodating" with "quite a bit of elasticity to it."  *Id.*, pp. 134-135.  He asserted that counsel should have objected that these statements did not qualify as opinion testimony and were unsupported by scientific facts.  *Id.*  Petitioner construed her testimony as, "[i]n other words" to be that there probably was sexual abuse "even though there was no proof."  Ex. N, p. 134.  "As a fairly educated man," Petitioner interpreted this "to mean that when sexual abuse is alleged, the Defendant should be considered guilty until proven innocent.  Or, there is no way to prove that the Defendant is not guilty."  *Id.*, p. 139 (set forth in support of ground ten).

Petitioner claimed both the identified statements were legally insufficient as opinion testimony, because "[i]n order for opinion testimony to be allowed, it must tend to support or negate a 'scientific fact.' " *Id.*, p. 135.  He claimed a lack of scientific fact to support the opinions of Myers, yet counsel never challenged her testimony.  *Id.*

Labeled as ground ten of his Rule 3.850 motion, Petitioner claimed counsel was ineffective for failing to object to Myers's qualifications as an expert witness.  *Id.*, p. 137. He claimed reasonable counsel should know that only "advanced registered nurse practitioners," with a specialty in pediatrics or family medicine, are qualified as consultants for the Child Protection Team.  *Id.*, pp. 137-138, *citing* FLA. STAT. § 39.303(3)(c).  Yet, he argued, counsel only asked Myers if she was licensed in Florida and for how long.  *Id.*, p. 138.  Petitioner alleged counsel's failure to object "severely prejudiced" him because she testified that most sexual abuse leaves no physical damage, so lack thereof does not mean there was no abuse.  *Id.*, p. 139.  As set forth above, Petitioner thought this equivalent to testifying that an examination should be taken as evidence of sexual abuse.  *Id.*

Angela Myers testified that she is a licensed nurse practitioner and has worked with the Child Protection Team with respect to sexual assaults since 1996.  Ex. D, pp. 106-108.  She said that in her own practice, she specializes in dermatology, women's health care, and some primary health care.  *Id.*, p. 106.  In her role with the Child Protection Team, she is a supervisor, performs sexual assault examinations, and testifies as an expert witness.  *Id.*, p. 108.  She had conducted over 100 examinations of children for sexual assault and had previously testified as an expert witness in sexual assault cases approximately four times.  *Id.*

The state court denied Rule 3.850 relief on these two claims.  The court reasoned:

> At the time that witness Myers was called, the State of Florida qualified the witness as an expert witness.  The testimony given by the witness was therefore proper, and the failure of the Defendant's trial counsel to object cannot be said to be ineffective. . . .
>
> . . . This Court took into consideration, among other things, that witness Myers has been a member of the Child Protection Team since 1996, had her own medical practice, and had been qualified as an expert in the past, prior to finding that she was qualified as an expert.  The Defendant also argues that witness Myers' testimony was calculated to lead the jury to believe that he should be considered guilty until proven innocent.  Specifically, the Defendant object [sic] to the testimony that "[t]he results of the exam neither confirm or negate an allegation of sexual abuse.  Since most types of sexual abuse leave no physical damage or findings, an examination should not be viewed as evidence that sexual abuse did not take place."  This Court does not find that this statement has the meaning that the Defendant wishes to place upon it.  The statement means exactly what it says, that the results of the exam do not confirm or belie whether sexual abuse has taken place, and the jury was to make the final decision.  Thus, this Court finds that the witness was properly found to be an expert, and her testimony was properly admitted.

Ex. N, p. 96.

The state court therefore considered the arguments Petitioner claimed counsel should have made, but still found the witness properly qualified as an expert and her testimony properly admitted.  There was no error or resulting prejudice in counsel's failure to make an argument which would not have succeeded as a matter of state law.  The state court's adjudication was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts.  § 2254(d).

Respondent addresses Petitioner's general argument that Myers's testimony was prejudicial (doc. 8, p. 5(b)(5) (p. 20 in ECF), but argues it was not unfairly so.  Doc. 22,

pp. 38-39.  Relevant evidence may be excluded where the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."  Fla. Stat. § 90.403 (2002).  Relevant evidence introduced to establish guilt is almost by definition prejudicial, but the issue is whether the probative value is substantially outweighed by the danger of *unfair* prejudice.  Doc. 22, p. 39 (citing the statute, other citations omitted).  The testimony did not unfairly place the burden of proof upon Petitioner to show his innocence or unfairly prejudice him.  Instead, as the state court found, it was necessary for the prosecution to explain why a medical examination of the victim was inconclusive.  Had the prosecution failed to put on such evidence, Petitioner would have argued that a physical examination of the victim would have proved him to be innocent.  The prosecution was well within the bounds of evidentiary propriety to place this explanation before the jury.

The remaining arguments were not raised or considered in state court and are procedurally barred.  Petitioner has not established cause or prejudice for his default.  Also, none of these defaulted ineffectiveness claims set forth an argument that no reasonable counsel would fail to make.  For example, Petitioner claims counsel should have impeached Myers' testimony that the anal area was very red, as it was inconsistent with her inability to say for sure whether or not he had been abused, and inconsistent with Schmidt's testimony that the anus was only slightly red and that K.L. sometimes had diaper rash.  *Id.*, pp. 5(b)(4)-5(b)(5) (pp. 19-20 in ECF).  Petitioner claims counsel should have asked Myers if she was aware that the child's mother associated the redness with diaper rash and whether Myers thought it could be

consistent with diaper rash, "to which she would have been forced to answer in the affirmative." *Id.*, p. (5)(c) (p. 21 in ECF).

It cannot be said that no reasonable counsel would forgo pointing out such a slight inconsistency – to the extent that red and very red are inconsistent – when both statements were consistent with anal irritation.  To the extent that Myers might have answered that anal irritation was consistent with or could be confused with diaper rash (which is not shown), it cannot be said that no reasonable counsel would rather waive the argument than to emphasize, any more than necessary, the fact that at the  the time of the alleged sexual abuse the victim was so young he was still wearing diapers.

**Ground Five**

Petitioner claims counsel was ineffective for his failure to correctly and competently advise him of his constitutional right to testify in his own defense, and in failing to call Petitioner as a witness.  Doc. 8, p. 6 (p. 23 in ECF).  Petitioner claims that he told counsel before trial that he wanted to testify, and counsel said that he had not decided whether to call Petitioner and would wait until the state put on its case.  *Id.* Petitioner claims counsel did not tell him it was his own decision to make.  *Id.*  Petitioner asserts counsel made him believe he had to go along with counsel's decision on this matter.  *Id.*

Petitioner alleges that after the state rested he again told counsel he wanted to testify, and counsel told him there was no need as the state had not proved its case.  *Id.* Petitioner contends that counsel advised that the court would ask questions about this and Petitioner "must" answer those questions by saying yes.  *Id.*, pp. 6-7 (pp. 23-24 in ECF).  Thus, Petitioner claims, when the court asked him under oath whether it was his

decision not to testify, he said "yes" because counsel told him to give that answer.  *Id.*, p. 7 (p. 24 in ECF).

Petitioner claims he would have testified that:  the charges were false; he never engaged in any sexual conduct or activity with his son as a participant; Schmidt had learned he was having an affair and he believed she was getting back at him for his unfaithfulness by fabricating sexual abuse claims; Bronson fabricated the phone conversation and Petitioner's admission, and Bronson was motivated to do so (as set forth *supra*, ground one); FDLE Agent Mortenson never asked Petitioner if the allegations were true or if he molested his son, and had he had asked, Petitioner would have emphatically denied it that he did it or ever considered such a thing; and that Mortenson mischaracterized Petitioner's answers during the interview and Petitioner "would have testified as to the true nature of Mortenson's questions and his (Petitioner's) answers thereto."  *Id.*, pp. 8-9 (pp. 25-26 in ECF).

Petitioner also claims there was no reason for competent counsel *not* to call him as a witness, giving the following reasons:  Petitioner had no prior criminal record or convictions; there were no suppressed incriminating statements or confessions the state could have used for impeachment; and defense counsel would not have lost the right to make an opening and closing final argument to the jury.  *Id.*, pp. 8-9 (pp. 25-26 in ECF). Petitioner asserts that he would have been a good witness because:  he "is personable and articulate and would have made a good impression on the jury;" most jurors expect a defendant to take the stand and declare innocence and find a defendant guilty in the absence of testimony or evidence despite instructions to the contrary; Petitioner would have explained his wife's motivation to lie and rebutted the testimony of Bronson and

Mortenson; his testimony would have offset counsel's failure to impeach certain witnesses and put on a defense; and the prosecution's case was weak, based mostly on inconsistent hearsay testimony.  *Id.*, pp. 9-10 (pp. 26-27 in ECF).  Petitioner claims that he would have testified if properly advised, and that there is a reasonable probability that the outcome would have been different if he had testified.  *Id.*, pp. 10-11 (pp. 27-28 in ECF).

Petitioner was put under oath after the prosecution rested, and the court asked if he had made the decision not to testify in his behalf, and if that was the decision *he* had made.  Ex. D, pp. 172-173.  Petitioner answered "yes" to both questions.  *Id.*, p. 173. The state court rejected the Rule 3.850 claim that counsel was ineffective for "improperly infuenc[ing]" Petitioner's decision, based on Petitioner's statement to the court that he did not wish to testify.  Ex. N, p. 96. The state court found:  "The Defendant was presented with the opportunity to raise any questions or issues about his ability to testify at that time, and is estopped from raising this issue based upon his testimony."  *Id.*  This was not an "unreasonable determination of the facts in light of the evidence presented" to the court.  § 2254(d)(2).

Even if Petitioner could show that he answered "yes" that it was his decision not to testify, when the true answer was "no" (meaning he lied under oath), he cannot show prejudice.  His purported testimony that Schmidt learned he was unfaithful and he believed she was getting back at him by making up the charges was made known to the jury through Mortenson's testimony, that Petitioner told him so.  Testimony of Bronson's motivation to lie for blaming Petitioner when he (Bronson) lost his job would have entailed Schmidt's complaints that Petitioner and Bronson were smoking marijuana

together.  While such testimony might show some sort of grudge by Bronson (whether it would undermine Bronson's credibility on Petitioner's admission to sexual abuse seems unlikely), it would also show that Petitioner used drugs after this incident, after he claimed to be concerned about his cocaine use and had checked himself into a psychiatric hospital.

Petitioner claims he would have testified that the charges were false and that he never engaged in any sexual conduct with his son.  But when a criminal defendant chooses to testify in his own behalf, he also "[runs] the risk that the jury might conclude the opposite of his testimony is true."  Atkins v. Singletary, 965 F.2d 952, 961, n. 7 (11th Cir. 1992) (citation omitted).  "[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt."  United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995), *cert. denied,* 516 U.S. 1111 (1996), *see also* United States v. McCarrick  294 F.3d 1286, 1293 (11th Cir. 2002) (Brown and subsequent cases establish that a defendant's incredible testimony, where there is at least some corroborative evidence, is substantive evidence of guilt).

The testimony Petitioner claims he would have given, affirmatively denying  the offense or his prior admissions, would have been contradicted on all sides.  There was the consistent testimony of Schmidt, her mother, and Waters, ruled admissible before trial started, of what K.L. said his father did to him.  There was the testimony of Julie Schmidt and Bronson that Petitioner made the admission to them *the very same day* that K.L. said he did it.

Moreover, there was the testimony of Mortenson, who had no apparent motive to testify one way or another, that Petitioner said he had *no recollection of anything* that

happened the day of the incident.  He told Mortenson he did so much cocaine it was possible he could have done it and not remembered, but did not want to think he would do such a thing.[13]  Testimony affirmatively denying the conduct, and denying that he made admissions to his wife and to Bronson that same day, were not only contrary to the testimony showing that he did it and admitted it to two different people all on the same day, but to the later statement that he could not remember *anything* that happened that day.  Letting the jury hear that Petitioner made admissions the same day as the offense, and later claimed he used drugs and remembered absolutely nothing that happened that day, at *least* allowed room for some sympathy.  Failure to call Petitioner to testify on the record here could not have prejudiced the defense.

As there was no error of counsel, and even assuming error there was no prejudice in failing to call Petitioner to testify, the state court's adjudication of this ineffectiveness claim was not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts.  § 2254(d).

**Ground Six**

Petitioner claims counsel was ineffective for failing to contest admission of the child victim's hearsay statements.  Doc. 8, p. 11; p. 28 on ECF.  This involves a variety of inter-related arguments, so the court begins with a review of the state court record relevant to admission of the statements.

---

[13] Petitioner asserts that his testimony would have clarified the "true nature" of Mortenson's questions and his answers, that Mortenson never asked if he molested his son, and if asked he would have denied it.  This is unsupported by specific allegations as to what Mortenson actually asked and the substance of his answers.

The child hearsay notice was filed pursuant to FLA. STAT. § 90.803(23) on July 29, 2002.  Ex. E, pp. 250-251.  It provided that the source, method, or circumstances by which the statements were reported indicated truthfulness, that K.L. is a child victim with a physical, mental, emotional or developmental age of 11 or less, that the statements describe acts of sexual abuse or an offense involving an unlawful sexual act or contact performed in the presence of, with, by, or on K.L., and taking into consideration the maturity of the child, the nature and duration of the offense, the relationship of the child to the offender, reliability of the child to the offender, the reliability of the assertion, the reliability of the child victim, and other any other appropriate factors, the time, content, and circumstances provide sufficient safeguards to reliability.  *Id.*, p. 250.  The notice also provided that, "[u]nless unavailable as a witness within the intent of Chapter 90 of the Florida Statutes K.L. will testify."  Witnesses who would testify to the hearsay were listed – specifically, Myers, Waters, and Elaine Schmidt – with the date, circumstances, and content of the statement included by reference to discovery materials.  *Id.*, pp. 250-251.

A hearing was held in chambers on August 19, 2002.  Ex. F.  The only persons present were Judge Kennon, Linda Peacock (the Guardian ad Litem), K.L., and the court reporter.  Ex. F, p. 3.  When K.L. was asked how old he was, he held up four fingers.  *Id.*, p. 4.  He said his phone number was six, or thought six was at the very end.  *Id.*  The judge asked some simple questions about his teachers, who he lived with, where, whether they had pets, and what he liked to do, and he gave short, basic answers.  *Id.*, pp. 3-8.  Peacock expressed concern that this happened long ago, and for him "to have to re-live this is not going to be a good thing."  *Id.*, p. 7.  Asked if there

was anyone who used to live at his house who did not live there anymore, he answered "[m]y daddy." *Id.*, pp. 7-8.  He did not know his name but said he used to know it.  *Id.*, p. 8.  The court said "I don't think I need to get into any of that," and Peacock said "[o]kay."  *Id.*

    When the child left, defense counsel returned to the room and asked if a determination had been made.  *Id.*, p. 8.  The judge said he thought it would be "very difficult for that child to take the stand and testify.  And I asked some questions and they're basic questions, but if you got anywhere past the basics of his sister and the mama and where he lived, I don't think he'd be competent to testify."  *Id.*, p. 9.  Counsel said "[o]kay" and asked that a transcript be prepared of the interview, which was granted.

    The court then took testimony of what Waters and Julie Schmidt would say the child said.  Waters said that in his fifth session with her, K.L. was playing with toy cars and spontaneously told her "Daddy stuck his penis in my butt," that he "made a mess with his penis," and "white pee pee came out and it felt a little hurt."  Ex. F, pp. 15-16.  He told her ""[m]y daddy's penis is big.  It was hard and had bumps in it.  Mine is little."  *Id.*, p. 16.  He told her it happened when his mother was at the store and his sister was napping, his father came into his room where he was playing.  *Id.*  K.L. also told her that his father pulled his penis up and down which he demonstrated to her with hand gestures, and "said that he liked that and didn't cry, but that it hurt with his father put his penis in his butt."  *Id.*, p. 17.  He asked his father not to do it so hard and he stopped. *Id.*  On cross examination, defense counsel asked a number of questions about the four sessions during which no disclosure had been made.  *Id.*, pp. 19-23.

Julie Schmidt testified about K.L.'s statements to her in the car on January 11, 2001, after she had dropped Petitioner off at his cousin's house and was driving with the children in the back seat.  Ex. F, pp. 36-39.  She said "[j]ust out of the blue it came," and then she asked and he repeated it.  *Id.*, p. 39.  He told her it happened in the living room and it hurt.  *Id.*  He said he told his daddy it hurt and he stopped, but then did it hard again.  *Id.*  She said later at home she asked where it happened and he pointed to a chair in the living room.  *Id.*, pp. 39-40.  He told her his diaper was off and that his daddy cleaned him off with wipes.  *Id.*, p. 40.  She could not remember whether it was in the car or at home, that K.L. told her something about his daddy making him suck his penis.  *Id.*, pp. 41-42.  Counsel asked on cross examination what Schmidt would tell K.L. about why he was going to see Waters.  *Id.*, p. 50.  He asked about her confrontation with Petitioner .  *Id.*, p. 51.  He asked if they were divorced and she had custody of the children.  *Id.*, p. 52.  He asked if she had any explanation why K.L. would have used the term "ass" when she never heard him use it before.  *Id.*  He confirmed that she did not preserve the diaper, or find the wipes in the trash, and she said she did not think of it and the deputy did not ask.  *Id.*, pp. 52-53.

Before she left the hearing Schmidt asked if she could say something about her feelings about K.L. testifying, and was told she did not need to.  *Id.*, p. 53.  The prosecutor said he would prepare a proposed order granting admission of the statements, and counsel said he would prepare one denying admission.  *Id.*, p. 54.  It was agreed that might be easiest and the court indicated he had already heard everything.  *Id.*

Defense counsel presented a proposed order denying admission of the child hearsay statements under FLA. STAT. § 90.803(23).  Ex. N, pp. 107-108.  He listed as facts that the child was under the age of 12 and incompetent to testify, that the statements were not a "child-like description of the act" and the child "used terminology unexpected of a child" his age, citing State v. Townsend, 635 So. 2d 949, 957-958 (Fla. 1994).  He listed as a fact that before and during the time of the allegations there was "an ongoing domestic abuse between the parents," his mother and Petitioner, and the marriage has since been dissolved and the mother awarded custody.  Id., p. 107. Counsel also listed as a finding that Dr. Waters was unable to testify to what was discussed in over four hours of therapy before the incriminating statement was made, and the possibility of improper influence during such long therapy followed by only one session thereafter could not be overlooked.  Id., pp. 107-108.  Finally, he listed as a finding that the court could not consider any corroborating evidence in considering the reliability of the hearsay statements, citing Townsend and Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139 (1990).  Id., p. 108.

The court did not sign off on this proposed order, however.  The court adopted the order proposed by the prosecution.  The court found that K.L. met the statutory criteria under FLA. STAT. § 90.803(23), was incompetent to testify and therefore unavailable as a witness.  Id., p. 255-256 (order of September 4, 2002).  The court found that the indicia of reliability conformed with Florida law and Townsend.  Id., p. 255.  The court made these additional findings of facts in support of the ruling:

> 1) The child victim, K.L. was under 12 (twelve) years of age at the time the statements were made.

2) The statements made were not the product of a pending divorce, domestic dispute and/or custody battle.

3) The child was not promised anything, threatened or coerced in making the statements.

4) The statement to Julie Schmidt was made spontaneously and was not a result of suggestion or leading questions.  The statement was made within hours of the abuse to the child[']s mother in a relaxed and familiar atmosphere in the family vehicle and the family home.  The statements were recorded within twelve hours.

5) The statement to Dr. Mary Waters was made in a child friendly atmosphere.  Dr. Waters is an experienced psychologist and professional with extensive experience in counseling with small children that are victims of sexual abuse.  Notes were taken contemporaneously with the child[']s statements.

6) The relative age of the victim makes it unlikely that the abuse/acts described are within the knowledge of the average 3 (three) year old.

7) The acts described and terminology used were beyond that of an average 3 (three) year old witness.

8) The nature of the relationship between the defendant and victim (father and son) put the defendant in a position of trust.

9) From the material and evidence presented, there was not an apparent motive to lie.

10) The abuse was performed outside the presence of adults.

*Id.*, pp. 255-256.

Prior to trial, the State sought to introduce hearsay statements made by K.L. to Elaine Schmidt, and counsel objected.  Ex. D, p. 18.  He argued that they already had a hearing where she did not appear, the court already made a ruling, "and now on the morning of trial they're bringing her in."  *Id.*  The court wanted to hear the testimony and then "decide where we are."  *Id.*, p. 19.  Her testimony was proffered and counsel cross

examined her, then argued that the statement should not be admitted.  *Id.*, p. 27.  He

pointed out that the child was being punished at the time of the statement, different than

the other circumstances when he made statements which were found admissible.  *Id.*

> And in this situation, the child is being punished.  He's made this statement before.  He gains attention by making this statement.  He makes this statement and he's, you know, under the circumstances being punished.
>
> And the other thing, and it's a minor difference, but all the other reports I had was that the child he put his penis in my ass, and this time the child says he put his penis in my bottom.
>
> The State's made a big issue out of the child using the proper terminology and that type of thing.  This is a different statement that [sic] what we've heard before.

*Id.*, pp. 27-28.

The prosecutor argued that the statement was not coerced in any way under

Townsend, that the child was laying on his bed while his grandmother was talking to him

and rubbing his head.  *Id.*, p. 28.  She did not bring it up or ask leading questions.  *Id.*,

pp. 28-29.  He argued that "although it's not identical, it's consistent with the other

statements and the other evidence that the Court has heard up to this stage."  *Id.*, p. 29.

Defense counsel argued in rebuttal that his understanding of the Townsend and Wright

case was that they did not allow "the Court when considering the admissibility of any

one statement to consider corroborating evidence.  So, I think this statement should

stand or fall basically by itself."  *Id.*  He reiterated it was a different statement and made

when the child was being punished, and repeated his objection to timeliness of

presenting the witness.  *Id.*

The court said there was still trial, but he believed it met the <u>Townsend</u> test.  *Id.*,

pp. 29-30.  A separate written order was entered allowing admission of K.L.'s statement

made to Elaine Schmidt.  Ex. E, p. 259 (order of November 6, 2002). The court made

the following findings of fact:

> 1) The statement made by the child to Elaine Schmidt was consistent with the other evidence in the case.

> 2) The statement was made without prompting or leading questions by Schmidt.

> 3) The statement was made in the child's own bedroom, a relaxed calm non-intrusive atmosphere.

> 4) The child was crying at the time of the statement, made after viewing video tapes of his father.

> 5) The statement was made to the child's grandmother, a trusting relationship in private after explaining why he was acting up.

> 6) No motivation to fabricate was developed nor any reason for the defendant [sic, presumably victim] to lie.

*Id.*  Based on those facts the court found the statements met the standards of

<u>Townsend</u> and § 90.803(23).  *Id.*

Petitioner claims that counsel was ineffective for failing to object to the court's

finding that K.L. was incompetent at the hearing held on August 19, 2002, and then

failing to renew the objection when the statements were admitted at trial.  *Id.*, p. 11 (p.

28 in ECF).

Petitioner contends that on receipt of the notice of intent to present child hearsay

evidence, counsel should have prepared a motion to exclude the evidence because the

alleged victim was available and competent to testify and would not be adversely

affected or traumatized by testifying, because the evidence showed he was not upset or

traumatized when he told his mother about it, when Haskell arrived at the residence, or when the child talked to Mary Waters or his grandmother about it; that the hearsay statements were unreliable and untrustworthy because inconsistent and contradictory; and failure to have an available and competent witness testify at trial violated Petitioner's right to confront witnesses against him.  *Id.*, pp. 16-17 (pp. 33-34 in ECF). Had counsel made these arguments at the hearing and again when the hearsay was introduced at trial, Petitioner claims, the trial court would have excluded the evidence or the appellate court would have reversed on appeal.  *Id.*, pp. 17-18 (pp. 34-35 in ECF).

Respondent asserts that Petitioner never raised in state court a claim of ineffectiveness based on counsel's failure to object to the finding that the witness was incompetent or unavailable to testify, and has failed to show cause and prejudice for his default.  Doc. 22, p. 41.  A review of the Rule 3.850 motion reveals that Petitioner argued counsel was ineffective for failing to object to introduction of child hearsay, or alternatively move to suppress the hearsay .  Ex. N, pp. 148-154.  While Petitioner set forth the substance of the competency hearing, *Id.*, pp. 148-149, the focus of Petitioner's claim in state court was that the hearsay exception applies only after a determination of reliability has first been made, and that "such a determination is necessary to avoid violating a Defendant's constitutional rights of Confrontation and Due Process."  *Id.*, p. 150.  Petitioner did not argue that counsel was ineffective for failing to object to the finding that K.L. was incompetent or unavailable as a witness.  *Id.*, pp. 148-

154.  Petitioner has not alleged or demonstrated cause or prejudice for his procedural default of this claim.[14]

Petitioner also asserts ineffectiveness because, "[i]nstead of challenging admission of the child hearsay evidence, defense counsel merely agreed to prepare an order denying the State's request to present child hearsay evidence at trial, and the state would prepare an order granting its request."  Doc. 8, pp. 12-13 (pp. 29-30 in ECF).  He claims counsel failed to present oral or written argument for exclusion of the hearsay, and failed to argue alleged inconsistencies in the child's hearsay statements. *Id.*, pp. 13-16 (pp. 29-33 in ECF) (referencing the allegedly inconsistent statements). "Not once during those three witnesses' testimony," Petitioner claims, "did counsel object to the child hearsay testimony they gave," prejudicing him at trial and precluding appellate review.  *Id.*, p. 16 (p. 33 in ECF).

The state trial court rejected the ineffectiveness claim as raised in the Rule 3.850 motion.  The court found that a hearing had been held on August 19, 2002, both sides offered proposed orders, defense counsel made full and complete arguments, and the child hearsay was deemed admissible.  Ex. N, p. 97.  "As this issue was addressed in a

---

[14] Nor could he show error of counsel of counsel or prejudice.  A witness incompetent due to  very young age is unavailable for purposes of the statute. Townsend, at 954-956 (citations omitted) (involving hearsay statements of two year old victim in sexual abuse case).  Further, Petitioner does not seem to consider another possible result of claiming the child not unavailable under the statute; *i.e.*, that the child could actually be called to testify and the hearsay would be admissible.  Careful attention had been paid through the investigation not to prompt the child or ask him leading questions, and the result of trying to question him in court is completely unknown and would likely arouse sympathy if he gave an inconsistent statement or even denied anything happened.  Indeed, counsel objected (unsuccessfully) to the introduction of a photograph of the child's face as "only meant to elicit the sympathy of the jury," because his mother would testify to the child's age and the photograph was only relevant to the element of age.  Ex. D, pp. 47-50, 58-59.

pre-trial motion, the Defendant's trial counsel cannot be said to have been ineffective for

failing to raise an objection on a matter that had already been objected to and settled."

*Id.*

Petitioner has not shown this was contrary to or an unreasonable application of

clearly established federal law, or an unreasonable determination of the facts.  Counsel

made arguments which ultimately did not prevail, but Petitioner has not shown

ineffectiveness for failing to raise additional arguments.

Respondent also argues that, "[t]o the extent Petitioner seeks to rely on . . .

*Crawford v. Washington*, 541 U.S. 36 (2004), in support of his Confrontation Clause

claim, he may not do so."  Doc. 22, p. 46.  Crawford was decided after Petitioner's trial

and Respondent asserts, correctly so, that counsel cannot be constitutionally ineffective

for failing to predict a change in the law.  *Id.*, pp. 46-50 (collecting cases).  It does not

appear that Petitioner has made a Crawford confrontation claim here and, as noted

above, he never argued in state court that counsel should have sought confrontation of

the child witness.  Moreover, Crawford does not apply retroactively on collateral review.

Whorton v. Bockting, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).

**Ground Seven**

Petitioner claims effective assistance of counsel due to a conflict of interest, and

denial of due process when his two requests to dismiss counsel were denied without a

hearing.  Doc. 8, p. 19 (p. 36 in ECF).  He alleges that his attorney made only one visit

to him in the jail prior to the trial, and during that visit "tried to talk Petitioner into

accepting a plea bargain of 15 years incarceration followed by 15 years probation."  *Id.*

He alleges that "Stone made it clear to Petitioner that he thought him guilty, that he

didn't want to hear Petitioner's version of the facts, and that his only reason for the

consultation was to push Petitioner into accepting the plea bargain." *Id.* Petitioner

claims that he twice asked the court to appoint a different lawyer because counsel was

not working for him, and could not represent him to the best of his ability because he

had too many cases. *Id.*, pp. 19-20 (pp. 36-37 in ECF). Petitioner claims counsel

visited him only once after the second request was denied and before trial, again urging

him to accept a plea agreement. *Id.*, p. 20 (p. 37 in ECF). Petitioner claims that

counsel "gave [him] the impression he thought Petitioner guilty and therefore had no

intention of properly investigating and preparing the case for trial." *Id.*

Respondent asserts procedural bar because Petitioner did not raise this as a

constitutional issue in state court. Doc. 22, pp. 50-52. On appeal, Petitioner argued that

the trial court erred in failing to conduct an initial inquiry after he twice requested

dismissal of appointed counsel. Ex. J, pp. 15-23. It was argued that at least an initial

inquiry was required under Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973) and its

progeny. *Id.*[15] This was argued as error of the trial court and abuse of discretion, and

reversible either per se or under a harmless error standard. Petitioner did not claim a

---

[15] As set forth in Nelson, if a defendant wishes to discharge court appointed counsel before trial claiming incompetency of counsel, "the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute." Hardwick v. State, 521 So. 2d 1071, 1074-75 (Fla. 1988) (quoting Nelson and approving this procedure).

violation of due process, or assert ineffective assistance of counsel due to a conflict of interest.  *Id.*  Petitioner did not raise such claims in his Rule 3.850 motion. Ex. N., pp. 110-157.  *See, e.g.*, State v. Coney, 845 So. 2d 120 (Fla. 2003) (considering conflict of interest claim raised in the context of a Rule 3.850 motion).  Petitioner has not shown any cause or prejudice for his default and is not entitled to relief on this claim.

Further, Petitioner does not allege any facts here which could support a claim of ineffective assistance of counsel due to an actual conflict of interest which adversely affected counsel's performance.  *See* Hunter v. Secretary, Dept. Of Corrections, 395 F.3d 1196, 1200 (11th Cir. 2005) (collecting cases, including Strickland).[16]  *See also* Coney, 845 So. 2d at 134 (noting no "[explanation of] how these two interests are antithetical" where the alleged "conflict" was between counsel's duty to defendant and counsel's self interest in continuing to be appointed by the trial judge).  Defense counsel who believes evidence of his client's guilt is strong and that a plea bargain for a 15 year sentence should be considered does not necessarily act under a conflict of interest.

---

[16] "If a trial court improperly requires joint representation of co-defendants over timely objection, reversal is automatic.  *In all other conflict situations*, there is no Sixth Amendment violation, and thus no reversal, absent a showing that an actual conflict of interest adversely affected counsel's performance.  395 F.3d at 1200 (emphasis added) (collecting cases, including Strickland).  To demonstrate an actual conflict, a defendant must make a factual showing of inconsistent interests or point to specific instances in the record suggesting a conflict.  Quince v. Crosby, 360 F.3d 1259, 1264 (11th Cir.), *cert. denied*, 125 S.Ct. 436 (2004) (citations omitted).  To demonstrate an adverse effect, he must show counsel failed to pursue a reasonable alternative strategy because it conflicted with his other alleged loyalties.  *Id.*, at 1264-65 (citations omitted).

**Recommendation**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Petitioner Lyons, challenging the judgment and sentences of life and 30 years imposed by the Circuit Court of the Third Judicial Circuit, in and for Madison County, Florida, case number 2001-119-CF, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on May 13, 2009.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**